UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | |
|---|---|
| MURAD LADAK, | |
|       Petitioner, | |
| v. | No. 1:25-CV-194-H |
| KRISTI NOEM, et al., | |
|       Respondents. | |

## ORDER

Following a criminal conviction and a final order of removal, the United States unsuccessfully attempted to remove Murad Ladak to his native Pakistan in 2009. Ladak, too, tried to remove himself to Pakistan on his own accord multiple times and failed. ICE has now re-detained Ladak, aiming once more to remove him to Pakistan. Ladak's habeas petition (Dkt. No. 1) identifies seven grounds for relief, raising statutory and constitutional challenges to ICE's policy and procedures of re-detention, to the question of whether there is a significant likelihood of his removal in the reasonably foreseeable future, and ICE's policy of third-country removal.

ICE has constitutional and statutory authority to re-detain Ladak to effectuate his order of removal, and any alleged procedural violations in his re-detention were harmless. While it may not be significantly likely that ICE can remove Ladak to Pakistan in the reasonably foreseeable future, the requisite likelihood of removal exists in combination with the respondents' alternative plans to remove Ladak to a third country. Even so, Ladak's third-country removal claims are not yet ripe. The Court therefore denies Ladak's petition (Dkt. No. 1) and denies his motion for a temporary restraining order or preliminary injunction (Dkt. No. 2) as moot.

1.    **Background**

    A.    **Factual Allegations and Evidence**

Ladak's family illegally entered the United States in 1989, when Ladak was three years old. Dkt. Nos. 1 at 4; 8 at 6. All of his family resides in the United States, and he is aware of no family that still resides in Pakistan. Dkt. No. 14-1 at 3. In 2007, he pled guilty to debit card abuse, for which he ultimately served a 120-day jail term. Dkt. No. 8 at 6. When his sentence concluded in 2009, an immigration judge granted Ladak voluntary departure to Pakistan, which converted into a final order of removal when he failed to depart within four months. *Id.*; *see* Dkt. No. 9 at 22. Ladak spent most of 2009—from February to November—in ICE custody. *See* Dkt. No. 10 at 6. Because the Pakistani Consulate in Houston failed to complete its review of Ladak's travel-document request, ICE released Ladak on an order of supervision (OSUP) and directed him to submit documents to the Pakistani Consulate to assist in his removal. Dkt. No. 8 at 6.

Ladak did so, but the Consulate failed to issue a travel document. Dkt. No. 9 at 5. He tried again in 2010 and 2011, with the same result. *Id.* He tried yet again in 2018, this time submitting his birth certificate to the embassy as proof of his citizenship. Dkt. No. 1 at 6–7. The embassy responded: it denied his application, telling Ladak that his birth certificate was "insufficient documentation to process [his] application." Dkt. No. 1-2 at 5.

ICE re-detained Ladak on September 8, 2025 at his annual check-in. Dkt. No. 1 at 7. The government has consistently represented it is in the process of removing Ladak to Pakistan. *See* Dkt. Nos. 9 at 26–27; 12 at 1–2; 13 at 5.[1] The parties dispute whether that

---

[1] Earlier in this litigation, Ladak asserted that ICE told him he would be removed to El Salvador (Dkt. No. 1 at 7), which ICE denied (Dkt. No. 9 at 26–27). In his most recent declaration, Ladak acknowledges that ICE has been attempting removal to Pakistan. *See* Dkt. No. 14-1 at 3.

process is ongoing due to supplemental document requests or whether Ladak's travel-document application has been denied.  *Compare* Dkt. Nos. 14; 14-1 (claiming application was denied), *with* 16 (claiming process is still underway).  If Pakistan denies the travel-document application, ICE "will consider" removal to a third country.  Dkt. No. 16 at 2.  However, no third country of removal has been identified, and plans will not be made until and unless Pakistan denies Ladak's travel-document application.  Dkt. No. 12 at 1–2.  Ladak was originally detained at Bluebonnet Detention Center (Dkt. No. 1 at 7) but has since been transferred to Eden Detention Facility (Dkt. No. 14-1 at 3).

Ladak petitions for habeas relief.  Attached to his habeas petition are several exhibits: Ladak's affidavit (signed on his behalf by counsel), Dkt. No. 1-2 at 3–4, his 2018 travel-document request and the letter denying that request, *id.* at 5–7, and an online document verifying his 2009 voluntary departure, *id.* at 8–9.  In turn, the respondents offer several exhibits: the declarations of deportation officers detailing the United States' removal efforts in this case, Dkt. Nos. 9 at 4–6, 26–27, and in other cases involving Pakistani nationals, *id.* at 4–6, 8–9, documents from Ladak's criminal case, *id.* at 11–16, and documents relating to Ladak's removal proceedings, *id.* at 18–24.

After supplemental briefing, Ladak filed additional exhibits, including a second affidavit from Ladak (signed on his behalf by counsel) addressing the Pakistan removal efforts, Dkt. No. 14-1 at 2–3, and letters of support from his children, wife, mother, brother, cousin, sister's husband, friends, and coworkers, *id.* at 4–25.  The respondents also filed additional declarations from deportation officers clarifying removal efforts as of November and December 2025.  Dkt. Nos. 13; 16 at 4–6.

**B.    Procedural Background**

On September 29, 2025, Ladak filed a petition for a writ of habeas corpus in this Court.  Dkt. No 1.  He also filed a motion for a TRO or preliminary injunction to prevent his removal.  Dkt. No. 2.  The same day, the Court ordered the respondents to show cause why Ladak's writ should not be granted and to respond to his motion for a TRO or preliminary injunction.  Dkt. No. 4.  The respondents filed their response on October 17, 2025.  Dkt. No. 8.  Ladak filed his reply on October 31.  Dkt. No. 10.

On November 7, the Court issued an order directing the respondents to address (1) whether it would remove Ladak to a third country if Pakistan declined his travel-document application; (2) if so, whether Ladak's third-country-removal claims would be ripe; and (3) the merits of Ladak's third-country-removal claims.  Dkt. No. 11.  The government responded (Dkt. No. 12) and Ladak replied (Dkt. No. 14).  The habeas petition and motion are ripe for review.

**2.    Legal Standards**

**A.    Procedural Due Process**

For well over a century, the Supreme Court has held that men and women subject to deportation have at least some measure of procedural due process protection.  *See The Japanese Immigrant Case*, 189 U.S. 86 (1903).  But the level of process to which they are entitled varies.  *Compare Landon v. Plasencia*, 459 U.S. 21, 34–35 (1982) (providing a process standard also provided to citizens), *with DHS v. Thuraissigiam*, 591 U.S. 103, 138–39 (2020) (providing minimal process).  In this case, the parties propose two different standards of due process: that of *Mathews v. Eldridge*, 424 U.S. 319 (1976), and that of *Zadvydas v. Davis*, 533 U.S. 678 (2001).

– 4 –

Under the *Mathews* test, a Court balances "the interest at stake for the individual, the risk of an erroneous deprivation of the interest through the procedures used as well as the probable value of additional or different procedural safeguards, and the interest of the government in using the current procedures rather than additional or different procedures." *Landon*, 459 U.S. at 34 (citing *Mathews*, 424 U.S. at 334–35).

The Supreme Court decided *Zadvydas* and applied its test in the context of detention to enforce a final order of removal under 8 U.S.C. § 1231. Under that statute, the government must ordinarily remove an alien within 90 days of the final order of removal or else release him subject to supervision. 8 U.S.C. § 1231(a)(3). However, Section 1231(a)(6) provides that certain aliens "may be detained beyond the removal period." In *Zadvydas*, the Supreme Court interpreted Section 1231(a)(6) to determine how long the government may detain an alien pending removal under this Section. 533 U.S. at 682. The Court first determined that challenges to detainment under this provision are available under 28 U.S.C. § 2241, which is the basis of Ladak's habeas petition. *See id.* at 688; Dkt. No. 1 at 3–4. Turning to the merits, the Supreme Court concluded that the government may not detain indefinitely aliens under this provision. *Zadvydas*, 533 U.S. at 699. Doing so would violate due process because such long-term detention requires "a criminal proceeding with adequate procedural protections." *Id.* at 690 (emphasis omitted). Rather, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. Courts facing these questions "must ask whether the detention in question exceeds a period reasonably necessary to secure removal." *Id.*

A court measures reasonableness "primarily in terms of the statute's basic purpose, namely, assuring the alien's presence at the moment of removal." *Id.* Courts must also

"take appropriate account of the greater immigration-related expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive INS efforts to enforce this complex statute, and the Nation's need to 'speak with one voice' in immigration matters." *Id.* at 700.  Further, courts must "listen with care when the Government's foreign policy judgments, including . . . the status of repatriation negotiations, are at issue, and to grant the Government appropriate leeway when its judgments rest upon foreign policy expertise." *Id.*

"[T]o limit the occasions when courts will need to make" difficult judgments, the Supreme Court recognized a "presumptively reasonable period of detention" of six months. *Id.* at 700–01.  After that six-month period, the alien has the burden of providing "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701.  After meeting this burden, the burden shifts to the respondents to provide evidence to rebut the alien's showing.  *Id.*  "[A]n alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.*

### B.    The INA Removal Provisions

Federal regulations govern the issues in this habeas petition as well.  8 C.F.R. § 241.4(l)(2)(iii) gives the government discretion to end an OSUP "to enforce a removal order."  Whether changed circumstances have arisen to permit removal are governed by 8 C.F.R. § 241.13.  *See* § 241.4(b)(4).  Section 241.13(a) "establishes special review procedures for those aliens who are subject to a final order of removal and are detained under the custody review procedures provided at § 241.4 after the expiration of the removal period, where the alien has provided good reason to believe there is no significant likelihood of

removal to the country to which he or she was ordered removed . . . in the reasonably foreseeable future."  Section 241.13(i)(2) of this regulation provides that "[ICE] may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future."

### C.    Ripeness

Ripeness doctrine rests upon Article III's limitation of federal judicial authority to "Cases" and "Controversies."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 & n.5 (2014).  Often, whether a party has standing—as by an actual or imminent injury in fact— and whether the party's claim is ripe for review are "the same question."  *Id.* at 157 n.5 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)).  As such, a "claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *Texas v. United States*, 523 U.S. 296, 300 (1998) (ultimately quoting 13A Charles A. Wright et al., Federal Practice and Procedure § 3532 (1984 ed.)).  To the extent the injury-in-fact standing requirement informs ripeness doctrine, the typical case requires that the injury is "clearly impending" and does not rely upon an "attenuated chain of inferences" that must occur before the harm will accrue.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013).

### 3.    Analysis

Ladak challenges his detention on a variety of grounds.  First, he claims the respondents lack any constitutional, statutory, or regulatory authority to detain him.  Second, he challenges the respondents' compliance with the INA and its implementing regulations.  Third, he contends that the *Mathews* standard of due process should govern his

case. Fourth, he challenges the likelihood of his removal in the reasonably foreseeable future. Fifth, he challenges the necessity of his detention notwithstanding that likelihood. And last, he objects to the respondents' third-country removal policies. Each claim fails in turn.

### A. The respondents have the authority to re-detain Ladak to effectuate his removal.

Ladak's habeas petition urges that "[t]here is no statute, constitutional provision, or other source of law that authorizes [the] Respondents to re-detain . . . Ladak for any amount of time." Dkt. No. 1 at 27. To the extent Ladak's ultra-vires claim is a repeat of his claims regarding procedural and substantive due process, they fail for the reasons discussed *infra*, Analysis § 3(B)–(E). And to the extent Ladak urges that the Constitution and the INA simply do not provide the respondents with the authority to detain Ladak (apart from his due-process claims), his contention is incorrect.

It is beyond dispute that Congress has authority to regulate immigration. "The United States . . . are vested by the [C]onstitution with the entire control of international relations, and with all the powers of government necessary to maintain that control, and to make it effective." *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893). Naturally, "the admission and exclusion of foreign nationals is a fundamental sovereign attribute." *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (internal quotation marks omitted). For that reason, the fifty States of this Union "are expressly forbidden to enter into any treaty, alliance, or confederation; to grant letters of marque and reprisal; to enter into any agreement or compact with another state, or with a foreign power; or to engage in war." *Fong Yue Ting*, 149 U.S. at 712; U.S. Const. art. I § 10. It is proper, then, for Congress to effectuate the Nation's sovereignty by removing certain aliens and to effectuate removal through

– 8 –

detention.  *See Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("We think it clear that detention or temporary confinement, as part of the means necessary to give effect to . . . the exclusion or expulsion of aliens, would be valid.").

Ladak next questions whether any statute permits his detention.  He develops this contention in his reply brief, contending that the original 90-day period has expired and that the INA only permits removal under the "[s]uspension of period" clause, 8 U.S.C. § 1231(a)(1)(C).  *See* Dkt. No. 10 at 2–3.  A first-blush review of this subsection alone would suggest Ladak's argument is persuasive.  Subsection (a)(1)(A) provides that, "[e]xcept as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  Subsection (a)(1)(B) defines the removal period—which for Ladak has long since passed—and subsection (a)(1)(C) provides that the removal period may be extended if the alien obstructs his removal—which is irrelevant here.  If that was the entirety of Section 1231, then Ladak might very well have the correct read of the statute.

But Ladak's analysis ignores the opening clause of subsection (a)(1)(A): the provisions of (a)(1) apply "[e]xcept as otherwise provided" in Section 1231.  Below, in subsection (a)(3), the INA provides that "[i]f the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General."  This is the OSUP provision.  The plain import of the "pending removal" clause is that the United States will eventually remove an alien after his removal period has expired—whether he consents to the removal or not.  Indeed, coercion is explicit in subsection (a)(3)'s mandatory regulations providing for regular check-ins, medical and psychiatric examination, disclosure of requested information,

and obedience to "reasonable written restrictions on the alien's conduct or activities that the
Attorney General prescribes for the alien."  8 U.S.C. § 1231(a)(3)(A)–(D).  Though the
statute does not necessarily require detention, it authorizes the Attorney General to use her
discretion to set conditions for supervision, and one such provision empowers the
respondents to re-detain an alien "to enforce a removal order."  8 C.F.R. § 241.14(l)(2)(iii).
As explained *infra*, Analysis § 3(D), Ladak's detention is appropriate under this provision
because there is a significant likelihood of his removal in the reasonably foreseeable future.

Thus, absent a claim for due process or other constitutional violations, the
respondents acted and continue to act within their authority under the Constitution, the
INA, and the INA's implementing regulations.

> **B.**     **Even assuming that the respondents did not follow the procedural
> requirements of 8 C.F.R. §§ 241.4(l) and 241.13, Ladak would not be
> entitled to habeas relief because any error was harmless.**

Ladak states that "several procedural steps are required to revoke release" and urges
that "none of [them] were followed here."  Dkt. No. 1 at 24.  Ladak develops this point in
his motion for a TRO or preliminary injunction, where he states that his re-detention
violates INA procedure because the respondents failed to (1) notify Ladak of the reasons for
his re-detention, (2) conduct an initial informal interview that would provide him an
opportunity to respond, (3) allow him to submit evidence or information to establish the
absence of a significant likelihood of his removal in the reasonably foreseeable future, and
(4) consider the factors demonstrating the presence or absence of a significant likelihood of
removal in the reasonably foreseeable future.  Dkt. No. 2 at 10–11; *see* 8 C.F.R. §§ 241.4(l),
241.13(f), (i)(3).

For the purpose of this analysis, the Court assumes that the respondents have yet[2] to follow the procedural requirements of Sections 241.4(l) and 241.13(i)(3) and the factors for consideration in Section 241.13(f). Harmless error applies in immigration cases generally. *Rangel-Betancourt v. Barr*, 820 F. App'x 253, 255 (5th Cir. 2020) (citing *Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 407 (5th Cir. 2010)); *Jalloh v. Garland*, No. 202117, 2023 WL 1859918, at *2 (4th Cir. Feb. 9, 2023) (citing *Ngarurih v. Ashcroft*, 371 F.3d 182, 190 n.8 (4th Cir. 2004)) (further citation omitted). The same is true for an agency's procedural violations. *See City of Arlington v. FCC*, 668 F.3d 229, 243–44 (5th Cir. 2012). Under a harmless-error analysis, the party asserting error bears the burden of demonstrating prejudice. *Id.* at 243.[3]

The facts here are materially similar to a recent decision of this Court, *Nguyen v. Noem*, 797 F. Supp. 3d 651 (N.D. Tex. 2025) (*Nguyen v. Noem*). There, the petitioner challenged his detention process as a violation of Section 241.13(i)(3), which governs revocation of an OSUP for removal. Section 241.13(i)(3) requires "notice, an informal interview, and a limited opportunity to respond and present information regarding the changed circumstances." *Id.* at 663. Here, as in that case, Ladak has had the opportunity to obtain counsel, to make a full argument to a federal court regarding his detention, submit evidence, respond to the respondents' arguments, and benefit from the Court's orders asking for more information and promises from the respondents. *See id.*; *see* Dkt. Nos. 1–2; 4; 10–

---

[2] The Court notes that there is no particular timeline in which these procedures must happen. The procedures all take place after the alien is detained, so they are not precursors to detention. *See* 8 C.F.R. § 241.13(i)(3) (providing that these procedures arise "promptly after [an alien's] return to [ICE] custody").

[3] Ladak cites three cases addressing violations of the INA's procedures. *Hoac v. Becerra*, No. 2:25-CV-01740, 2025 WL 1993771 (E.D. Cal. July 16, 2025); *Phan v. Becerra*, No. 2:25-CV-1757, 2025 WL 1993735 (E.D. Cal. July 16, 2025); *Nguyen v. Hyde*, 788 F. Supp. 3d 144 (D. Mass. 2025). None of them consider whether the alleged violations were harmless and so are inapposite.

11.  As a result, Ladak "has clearly been given notice because the respondents have fully explained through briefing and declarations the basis for their conclusion." *Nguyen v. Noem*, 797 F. Supp. 3d at 663.  Because Ladak has received more than full notice and an opportunity to be heard, even if the respondents failed to conform to the regulations set forth in Section 241.4(l)(1) and the factors for consideration in re-detention in Section 241.13(f), any error is now harmless in light of the procedures in this case.  There is no basis, on these grounds, for ordering Ladak's immediate release.  Because habeas is not backward-looking, the process provided now renders forward-looking relief separately inappropriate.  *See Walker v. Wainwright*, 390 U.S. 335, 336 (1968) ("[T]he great and central office of the writ of habeas corpus is to test the legality of a prisoner's current detention."); *Lane v. Williams*, 455 U.S. 624, 631 (1982) (explaining that where detainment or its consequences have expired, a habeas petition is moot); *Nguyen v. Noem*, 797 F. Supp. 3d at 670 (same).[4]

## C.     *Zadvydas*, not *Mathews*, governs this habeas petition.

The parties dispute whether the Supreme Court's removal-specific due-process decision in *Zadvydas*, or the balancing test from *Mathews* and *Landon*, govern this case.  For his part, Ladak accepts that *Zadvydas* is precedent, but he asserts that *Mathews* nonetheless governs alongside *Zadvydas* because he is being detained despite his past compliance with the OSUP.  *See* Dkt. No. 10 at 5–6.

---

[4] Because any error would be harmless, the Court need not address Ladak's contention that Section 241.13(f) is a set of requirements, as opposed to discretionary factors.  *But see Nguyen v. Noem*, 797 F. Supp. 3d at 666 (observing that Section 241.13 "gives the decision-making power primarily to ICE and not to this Court"); *id.* at 667–68 ("Section 241.13(f) simply provides a nonexhaustive list of factors.  There is no textual suggestion that any of these factors is necessary or sufficient.").

It is necessary to address whether *Mathews* governs this case because *Mathews* arguably applies a stronger degree of protection than *Zadvydas*. In *Landon*, the Supreme Court applied *Mathews* to a case involving a lawful permanent resident after noting that such aliens have a different "constitutional status" than those apprehended at the border. 459 U.S. at 32–34. Whereas *Zadvydas* is satisfied by showing a significant likelihood of removal in the reasonably foreseeable future, Ladak emphasizes that—even if such a likelihood of removal exists—his detention violates *Mathews*'s due-process protections given that "[n]one of [his] behavior or personal history indicates that [he] is a flight risk" or an "[e]specially dangerous individual." Dkt. No. 10 at 5.

Thus, the Court considers Ladak's contentions. His arguments rest on two supports. First, he urges that *Mathews* generally applies "[t]o determine whether a civil detention violates a detainee's due process rights." *Id.* at 6 (quoting *Hernandez-Fernandez v. Lyons*, 5:25-CV-773, 2025 WL 2976923, at *8 (W.D. Tex. Oct. 21, 2025)). Second, he relies on the persuasive authority of several district and circuit courts, as the Fifth Circuit has not yet addressed this question.[5]

Ladak's first assertion—that *Mathews* merely applies because of his detention—runs counter to precedent. In *Dusenbery v. United States*, the Supreme Court explained that it has "never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." 534 U.S. 161, 167–68 (2002). More obviously, in many "immigration-detention

---

[5] *See Hernandez-Fernandez v. Lyons*, 5:25-CV-773, 2025 WL 2976923, at *8 (W.D. Tex. Oct. 21, 2025); *Martinez v. Noem*, No. 25-CV-430, 2025 WL 2965859, at *3 (W.D. Tex. Oct. 21, 2025); *Günaydın v. Trump*, 784 F. Supp. 3d 1175, 1185 (D. Minn. 2025); *Hernandez-Lara v. Lyons*, 10 F.4th 19, 27–28 (1st Cir. 2021); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). The Ninth Circuit has also adopted the *Mathews* test. *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022). The Fourth Circuit applied *Mathews* to Section 1226 but rejected its application to Section 1231. *Compare Miranda v. Garland*, 34 F.4th 338, 358–59 (4th Cir. 2022), *with Castaneda v. Perry*, 95 F.4th 750, 760 (4th Cir. 2024).

challenges, the Supreme Court has not relied on the *Mathews* framework." *Rodriguez Diaz*, 53 F.4th at 1214 (Bumatay, J., concurring) (citing *Demore v. Kim*, 538 U.S. 510, 521–31 (2003); and *Reno v. Flores*, 507 U.S. 292, 299–315 (1993)). Chief among these is *Zadvydas* itself. The Supreme Court interpreted Section 1231 to contain a measure of due-process protections "to avoid a serious constitutional threat." 533 U.S. at 699. It is not as if the Supreme Court intended to integrate *Mathews* into its reasoning: it cited *Landon* to acknowledge that "the nature of [due process] may vary depending upon status and circumstance" and then proceeded with its own distinct test for due-process protection. *Id.* at 694.

Even were the Court to set aside the *Mathews* three-factor test's conspicuous absence in *Zadvydas*, *Demore*, and *Reno*, application of the *Mathews* test is unwarranted on the test's own terms. As the Supreme Court explained in *Landon*, "[t]he constitutional sufficiency of procedures provided in any situation . . . varies with the circumstances." 459 U.S. at 34. *Landon* distinguished its peculiar type of immigration case—involving a long-time lawful permanent resident—from border detentions of aliens at the border or returning lawful permanent residents who had spent time abroad. *Id.* at 32–33. By contrast, aliens detained at the border are only entitled to "the procedure authorized by Congress." *Thuraissigiam*, 591 U.S. at 138–39 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

Here, Ladak fits firmly into the latter category. As *Thuraissigiam* explains, "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" *Id.* at 139 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953)). Ladak is one

– 14 –

such alien: he entered the United States illegally as a minor, was ordered removed, and has only been paroled into the country during these 16 years because the United States has thus far failed to remove him. He is therefore only entitled to a more limited form of process. *See Thuraissigiam*, 591 U.S. at 139 (collecting cases).

Finally, the most persuasive reading of *Zadvydas* is not that it provides a due-process test in addition to *Mathews*, but that it supplants it outright. As the Sixth Circuit explained, "the Supreme Court has had occasion to consider the constitutional implications of indefinite detention under [Section] 1231(a). In applying the canon of constitutional avoidance, the Court offered us a standard through which to judge indefinite-detention cases—the *Zadvydas* standard . . . ." *Martinez v. Larose*, 968 F.3d 555, 566 (6th Cir. 2020). "In other words, the *Zadvydas* standard *is* due process: a [Section] 1231 detainee who fails the *Zadvydas* test fails to prove a due process violation." *Castaneda*, 95 F.4th at 760 (emphasis in original).

Ladak's cited cases offer nothing in rebuttal, as they are all unreasoned. *See supra* n.5. Thus, for the three independent reasons above—the Supreme Court's consistent decision to apply specialized tests to immigration due-process cases instead of *Mathews*, the nature of *Mathews*'s application in *Landon* compared to the facts of this case, and because *Zadvydas* displaces *Mathews* in Section 1231 cases—the Court applies *Zadvydas* alone in its analysis of Ladak's due process claims.

**D.   Because circumstances have changed and there is now a significant likelihood that Ladak may be removed to Pakistan or another country in the reasonably foreseeable future, the respondents did not violate 8 C.F.R. § 241.13 or the Fifth Amendment.**

Ladak asserts that the respondents violated Section 241.13(i)(2), as well as the Due Process Clause of the Fifth Amendment, when they re-detained him without there being

– 15 –

changed circumstances. *See* Dkt. No. 1 at 24. Because both the alleged regulatory and constitutional violations turn on the same question of law, the Court addresses them together and concludes that changed circumstances justify Ladak's detention. Thus, there is no violation of Section 241.13(i)(2) or the Fifth Amendment under the standards generally applicable under *Zadvydas*.

"But before turning to the merits of this discussion, the Court must consider the appropriate standards." *Nguyen v. Noem*, 797 F. Supp. 3d at 665. The operative language is that ICE "may revoke an alien's release under this section and return the alien to custody if, on account of changed circumstances, [ICE] determines that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). "This regulation gives the decision-making power primarily to ICE and not to this Court," such that the Court's review "is necessarily limited." *Nguyen v. Noem*, 797 F. Supp. 3d at 666. To prevail, the respondents need only establish "a significant likelihood that removal in the reasonably foreseeable future may occur," rather than "be certain or immediate." *Id.* at 666–67 (citing 8 C.F.R. § 241.13(i)(2)).

The facts in this case do not—at first—appear to favor a finding of a significant likelihood of removal in the reasonably foreseeable future. In short, Ladak was previously ordered removed to Pakistan. Both the government and Ladak have repeatedly attempted to secure travel documents from Pakistan, but the Pakistani Consulate has either delayed or refused to provide the documents. The respondents initially represented that they could return Ladak using the same information Ladak used in his 2018 attempt. That has now failed, and the respondents now represent that their supplemental documents will turn the tide. *See* Dkt. No. 16 at 5–6.

– 16 –

To be sure, the fact that "the previous attempt to deport [an alien subject to removal] failed does not bar the government from trying again." *Surovtsev v. Noem*, No. 1:25-CV-160, 2025 WL 3264479, at *6. But a renewed attempt should at least take into account whether "circumstances" in the country of removal have changed in some form that would render a renewed attempt more than a shot in the dark. *See id.* at *6–7 (noting that changed circumstances in Ukraine warranted detention, even though the reason for the initial denial of travel documents remained in effect). At best, the respondents indicate that the government has removed three times the number of Pakistani nationals (to Pakistan or elsewhere) than it did in 2023 (Dkt. No. 9 at 8) and that Pakistan has not previously denied travel-document applications (Dkt. No. 16 at 5–6). This information creates the potential for removal in the reasonably foreseeable future. But it does not appear to be significantly likely.

That conclusion, however, does not end the case because Pakistan "is not the only possible path to removal." *Id.* at *7. Both parties agree that third-country removal is on the table. *See* Dkt. Nos. 1-2 at 4; 16 at 2. Ladak notes that the administration has deported "hundreds" of individuals to countries in Latin America, Europe, and Africa. *See* Dkt. No. 1 at 9. For their part, ICE denies that it plans to remove Ladak to El Salvador, as Ladak initially claimed (Dkt. No. 9 at 26–27), but it agrees that it will consider third-country removal if Pakistan rejects his application for travel documents (Dkt. No. 12 at 1–2).

Moreover, at the time of his 2009 removal attempt, "ICE rarely pursued third-country removals." *Surovtsev*, 2025 WL 3264479, at *6 (internal quotation marks omitted). "But as of 2025, ICE now actively pursues third-country removals, granting the agency expanded options." *Id.* (internal quotation marks omitted). In this respect, Ladak's case is

similar to *Surovtsev*.  Like the petitioner in that case, Ladak does not dispute that third-country removal is a possibility.  Indeed, he has heavily briefed issues relating to the possibility of third-country removal.  *See* Dkt. Nos. 1 at 16–20, 27–30; 10 at 9–11.  "While ICE has not offered detailed plans for third-country removal, none are necessary at this time."  *Surovtsev*, 2025 WL 3264479, at *7.  "The Court is obligated to 'give due weight to the likelihood of successful future negotiations.'"  *Id.* (quoting *Zadvydas*, 533 U.S. at 702) (internal alteration omitted).  And "[i]n light of the undisputed policy, the Court 'has no reason to believe that these efforts will be unsuccessful'" if pursued.  *Id.* (quoting *Misirbekov v. Venegas*, 796 F. Supp. 3d 436, 439 (S.D. Tex. 2025) (noting that third-country removal efforts created a significant likelihood of removal in the reasonably foreseeable future)).

Ladak offers several arguments in rebuttal, but none are persuasive.  First, drawing on two cases, Ladak argues that the "intent to complete a travel document request" is insufficient.  *Phan*, 2025 WL 1993735, at *5; *Liu v. Carter*, No. 25-3036, 2025 WL 1696526, at *1–2 (D. Kan. June 17, 2025).  Perhaps so, but neither court on which he relies addressed whether third-country removal created a significant likelihood of removal in the reasonably foreseeable future for their respective petitioners.  Here, that factor is the decisive difference between Ladak's continued detention and his release.

Next, Ladak argues that his detention period from 2009 should be added to his current detention period today, such that he should be considered to be in detention for nearly two years rather than nearly five months.  *See* Dkt. No. 1 at 24.  The argument also appears to suggest that the Court emphasize the 16 years since his original detention on top of the two-year detention period.  *See* Dkt. No. 2 at 10.  This argument has two conclusions.  The first is a line of reasoning adopted in *Tadros v. Noem* and other cases, which concludes

that third-country removal is unlikely where years have elapsed since the last removal attempt. No. 25-CV-4108, 2025 WL 1678501, at *1 (D.N.J. June 13, 2025).[6] The second is that the respondents must offer up "documented confirmation" that Pakistan "will agree to accept [Ladak]." Dkt. No. 1 at 14.

The first line of reasoning is unpersuasive, even were the Court to adopt Ladak's timing argument. The Court previously addressed *Tadros* and similar cases in *Surovtsev*. The Court declined to adopt *Tadros*'s reasoning, observing that the court in that case "fail[ed] to account for the new administration's well-known sea change" in removing individuals to third countries with far greater frequency than before, and that, "[i]n essence," such reasoning impermissibly "turn[s] back the clock to what could have been done before January 20, 2025" without considering the changed circumstances that came after. 2025 WL 3264479, at *8 & n.9. For the same reasons, the Court is unpersuaded.

The second line of reasoning—Ladak's timing argument—merits this Court's attention. It is true that, as a period of detention continues without success, courts are rightly skeptical of the government's basis for continued detention and may demand additional evidence if the government fails to make good on its plans for removal. *E.g.*, *Agbada v. Ashcroft*, Civ. A. No. 02-30098, 2002 WL 1969660, at *1 (D. Mass. Aug. 22, 2002) (ordering removal or provision of removal confirmation within 90 days of the court's order). This Court has done so in other cases. *See Yaghoubi Yeganeh v. Warden, Bluebonnet Detention Facility*, No. 1:25-CV-121, Dkt. No. 18 at 2 (N.D. Tex. Nov. 12, 2025) (granting the

---

[6] *See also Douglas v. Baker*, No. 25-CV-2243, 2025 WL 2997585, at *4 (D. Md. Oct. 24, 2025); *S.F. v. Bostock*, No. 3:25-CV-1084, 2025 WL 2841022, at *4 (D. Or. Oct. 7, 2025); *Zavvar v. Scott*, Civ. A. No. 25-2104, 2025 WL 2592543, at *7 (D. Md. Sept. 8, 2025); *Nguyen v. Scott*, 796 F. Supp. 3d 703, 721–22 (W.D. Wash. 2025) (*Nguyen v. Scott*).

respondents "a final opportunity" to detail third-country removal efforts after prolonged detention). So, if the Court construed Ladak's detention period as nearly two years in length, it would be reasonable to demand a higher degree of proof than what might suffice early in the removal process.

The reality is, however, that Ladak was re-detained in September 2025. His current length of detention has been less than five months. It defies reality to construe his situation as otherwise, because the reasons for his re-detention—a new application and third-country removal—are only salient now. *Surovtsev*, 2025 WL 3264479, at *8 (rejecting a *Tadros* claim on similar grounds). Even courts that adopt Ladak's position acknowledge that *Zadvydas* does not require continuous counting. *Nguyen v. Scott*, 796 F. Supp. 3d at 721–22; *Chen v. Holder*, No. 6:14-CV-2530, 2015 WL 13236635, at *2 (W.D. Nov. 20, 2015). Rather, these courts count time in detention all together to prevent the undesirable consequence of permitting the government to detain someone, "release[] him from detention, and then re-detain[] him again," creating an indefinite cycle of detention that would violate the spirit of *Zadvydas*. *Nguyen v. Scott*, 796 F. Supp. 3d at 721–22 (collecting cases) (quoting *Sied v. Nielsen*, No. 17-CV-6785, 2018 WL 1876907, at *6 (N.D. Cal. Apr. 19, 2018)).

The fear that the government might abuse re-detention is understandable, but the Court is unpersuaded. ICE is not the only governmental entity that engages in re-detention: state and federal courts routinely revoke pretrial release, parole, and supervised release.[7] Yet none of these are subject to a rising tide of evidentiary burdens. To the contrary: federal pretrial detention and revocation of supervised release are subject to evidentiary standards

---

[7] *E.g.*, *Bell v. Wolfish*, 441 U.S. 520 (1979) (pretrial detention); *Morrison v. Johnson*, 106 F.3d 127 (5th Cir. 1997) (revocation of parole); *United States v. Tippens*, 39 F.3d 88 (5th Cir. 1994) (procedural rights for persons subject to revocation of supervised release).

far more forgiving than that of their centerpiece—a trial conviction with proof beyond a reasonable doubt. *See United States v. Roberson*, 547 F. Supp. 3d 560, 563–64 (N.D. Tex. 2021) (applying, at most, a preponderance-of-the-evidence standard in pretrial release revocations); *Johnson v. United States*, 529 U.S. 694, 700 (2000) (applying preponderance standard to supervised release revocations). It does not follow that American citizens can be subjected to a more relaxed standard of review for the re-detention process than the original detention process, yet aliens re-detained subject to an order of removal should receive a *higher* level of process by means of "documented confirmation" (Dkt. No. 1 at 14). *See Landon*, 459 U.S. at 32–33 (noting that aliens are typically due less process than citizens); *Thuraissigiam*, 591 U.S. at 138–39 (same).

Moreover, *Zadvydas* already provides a clear balance at the outer bounds of federal authority by ensuring aliens are only detained for "a period reasonably necessary to bring about [the] alien's removal from the United States." 533 U.S. at 689. Both initial detention and re-detention are united in this purpose, and the limit—that neither may result in indefinite detention or detention without a significant likelihood of removal in the reasonably foreseeable future—already polices the government from unconstitutional action.

There may be cases where the government cannot show a reasonable likelihood of removal at the time of re-detention, fails to produce any such evidence, and engages in repeat or periodic re-detentions of an alien despite failing to cure these deficiencies. That narrowly defined scenario would raise the concern of an indefinite cycle of detention. Not here: the Court will not force the respondents to forever bear the stain of failure from the 2009 removal attempt, despite their increased efforts at removing Pakistani nationals like

Ladak and despite of their initiative of third-country removal. Thus, the Court declines to view Ladak's detention through the lens of one detained for two years and considers his re-detention in the context of his confinement since September 2025.

Applying *Zadvydas* to a re-detainee like Ladak as the Court would to any other detainee raising a Section 1231 challenge, his "deportation is neither certain nor guaranteed." *Surovtsev*, 2025 WL 3264479, at *8. But as explained above, while it may not be that a significant likelihood of removal in the reasonably foreseeable future to Pakistan alone exists, the requisite likelihood is established "when combined" with the new and very real potential for third-country removal. *Id.* Accordingly, the Court rejects Ladak's claim that the respondents have violated the INA and the Fifth Amendment.

### E.    Ladak has not shown a substantive due process violation.

Ladak urges that his detention violates the substantive-due-process right to freedom from imprisonment because his detention "does not bear a reasonable relationship to the two regulatory purposes of detention: preventing danger to the community or flight prior to removal." Dkt. No. 1 at 22. Specifically, Ladak notes that, even if a significant likelihood of removal in the reasonably foreseeable future exists, ICE's "decision to revoke [his] OSUP ran counter to the evidence before the agency that [Ladak] would comply with a demand to appear for removal without detention." *Id.* at 25–26 (addressing detention-less means of removal in his Administrative Procedures Act claim). As the Court explained *supra*, Analysis § 3(B), any rule violation is harmless because the Court can now consider whether other factors merit release. Whether the INA and its implementing regulations require ICE to consider other removal methods is only salient if Ladak's substantive-due-process claim had merit. *See Iruegas-Maciel v. Dobre*, 67 F. App'x 253, 283 (5th Cir. 2003) (citing *Myers v.*

– 22 –

*Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (noting that the failure of officials "to follow their own policies, without more, does not constitute a violation of due process")).

Because "the *Zadvydas* standard *is* due process," Ladak is deprived of no liberty by his detention anticipating removal consistent with the protections set forth in that case. *Castaneda*, 95 F.4th at 760 (emphasis in original). The Court recognizes that Ladak has dutifully complied with his OSUP, and the Court will assume that he is neither a flight risk nor danger to the community. However, he has no "right . . . to remain in a foreign country." *Thuraissigiam*, 591 U.S. at 122. Congress is empowered to detain for "a period reasonably necessary to bring about [an] alien's removal from the United States." *Zadvydas*, 533 U.S. at 689; *see Wong Wing*, 163 U.S. at 235 (noting that the government may detain aliens as "part of the means necessary to give effect" to the order of removal). This is "the outer bounds" of Congress's authority, and once *Zadvydas* applies, Ladak's other considerations are insufficient to merit release. *Wang v. Ashcroft*, 320 F.3d 130, 146 (2d Cir. 2003); *see supra* Analysis § 3(C)–(D).

### F.  Ladak's third-country removal claims are not ripe.

Ladak faces a significant likelihood of removal in the reasonably foreseeable future, either to Pakistan or to a third country. In other words, there is a potential for removal to Pakistan that may be less than "significant," but a potential of removal to a third country that, when combined with the lesser odds of removal to Pakistan, becomes significant. The question, then, becomes whether this combined likelihood of removal in the reasonably foreseeable future suffices to render Ladak's claims relating to third-country removal ripe.

The question of whether Ladak's claims are ripe is the same as the question of whether he faces an imminent injury in fact. *See Driehaus*, 573 U.S. at 157 n.5. It is critical

to note here that there is a material difference in *Zadvydas*' significant-likelihood-of-removal standard and the imminent-injury-in-fact requirement. *Zadvydas* requires a likelihood that "is neither certain nor guaranteed." *Surovtsev*, 2025 WL 3264479, at *8. In contrast, Article III requires an injury to be "clearly impending." *Clapper*, 568 U.S. at 415 n.5. "'[A]llegations of possible future injury'"—even if there is some significant chance of injury—"are not sufficient." *Id.* at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). As a result, there may be some petitioners who challenge third-country removal who are significantly likely to be removed in the reasonably foreseeable future, who have a *possibility* of being removed to a third country, and who have yet to extinguish the "speculative chain of possibilities" that prevent them from establishing the requisite proof of imminent harm necessary for adjudication to be ripe. *See id.* at 414.

Here, Ladak alleges that ICE informed him that the Pakistani Consulate denied his travel-document application, asked for more information, and that—in the meantime—ICE was unsure of what steps it would take next. Dkt. No. 14-1 at 3. The respondents offer that the Pakistani Consulate informed ICE that Ladak's birth certificate was not enough and "requested any further identity documents for Ladak and his family members." Dkt. No. 16 at 5. However, they did not deny the application. *Id.* The government has consistently represented that its only plan for the time being is to remove Ladak to Pakistan. *See* Dkt. Nos. 8 at 19; 9 at 27; 12 at 1–2; 13 at 4–5; 16 at 2. ICE will only consider third-country removal if Pakistan denies the travel-document application. *See* Dkt. No. 16 at 2.

In other words, for Ladak's third-country removal claims to come ripe, Pakistan must first deny the government's supplemented travel-document application, and the respondents must then decide to pursue third-country removal. *See* Dkt. No. 9 at 27

– 24 –

(suggesting ICE might consider another OSUP if removal to Pakistan fails). Any of the harms claimed by Ladak's third-country removal claims are contingent on these two possibilities.

It is far from certain that both of these conditions will be met, even assuming there is not a significant likelihood of removal to Pakistan in the reasonably foreseeable future. International relations are a fluid matter, and, frequently, obstacles to deportation that appear insurmountable prove to be illusory. In *Surovtsev*, this Court noted that Ukraine had previously denied the petitioner's travel-document application because the documents supporting his Ukrainian citizenship were located in a town on the front line of that country's war with Russia. 2025 WL 3264479, at *6. Those documents were still inaccessible (and the town in ruin) when this Court denied the petitioner's habeas petition. *Id.* Days later, the petitioner re-filed in the Dallas Division of this District, because, against his expectations, ICE was successful in securing the travel documents notwithstanding the previous obstacle. *See Surovtsev v. Noem*, No. 3:25-CV-3065, Dkt. No. 1 (Nov. 10, 2025).

More to the point, in *Nasrabadi v. Villegas*, this Court ordered a petitioner removed to Iran. No. 1:25-CV-129, Dkt. No. 16 at 10 (N.D. Tex. Oct. 28, 2025). The petitioner suggested such removal was incredibly unlikely because the United States had bombed Iran months before. *Id.* But as the Court noted, the United States prevailed in removing a number of Iranian nationals to Iran shortly after the bombing campaign concluded. *Id.*; *see also Nguyen v. Noem*, 797 F. Supp. 3d at 665–66 (noting change in immigration policy in 2025 after decades-long moratorium).

In other words, although there may be a less than significant likelihood of removal to Pakistan, and although there may be a significant likelihood of removal in the reasonably

foreseeable future when combined with the *potential* of a third-country removal, it is far from "clear[]" upon which road the respondents will proceed. *Clapper*, 568 U.S. at 415 n.5. They may prevail at removal to Pakistan. They may resort to third-country removal. But although Ladak's removal in the reasonably foreseeable future is significantly likely, his claims are unripe so long as the respondents are actively pursuing removal to Pakistan.

Importantly, the Court's denial here does not mean that Ladak cannot raise his claims at a later time in a subsequent habeas petition if the government is unable to remove him to Pakistan and initiates plans for third-country removal. Subsequent habeas petitions are governed under the abuse-of-the-writ doctrine, which does not apply where "the factual or legal basis for a claim was not reasonably available to counsel." *United States v. Vargas-Soto*, 35 F.4th 979, 993 (5th Cir. 2022) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Because Ladak's third-country removal claim is not ripe, the Court's denial is without prejudice to the filing of a subsequent habeas petition if he remains detained and the respondents begin to seek third-country removal. Likewise, if efforts to remove Ladak to Pakistan "or a third country fall short and he is not released," then a subsequent habeas petition would be appropriate. *Surovtsev*, 2025 WL 3264479, at *8 n.10.

### G.    A hearing is not necessary.

"When the district court has sufficient facts before it to make an informed decision on the merits of the habeas petitioner's claim, it does not abuse its discretion in failing to conduct an evidentiary hearing . . . ." *Gallegos v. Quarterman*, 265 F. App'x 300, 303 (5th Cir. 2008) (citation modified). An evidentiary hearing is required only when the federal court lacks sufficient undisputed facts to make an informed decision. *Barrientes v. Johnson*,

221 F.3d 741, 770 (5th Cir. 2000). As the analysis above shows, no hearing is necessary here.

First, the dispute regarding the INA and the Fifth Amendment does not warrant a hearing. As explained above, the respondents have the constitutional, statutory, and regulatory authority to detain Ladak pending his removal. Even assuming that the respondents failed to abide by the procedural requirements of the INA, any error was harmless. And even if it were harmful error, a writ of habeas corpus ordering his release would not be the appropriate remedy.

Second, no hearing is necessary to dispose of Ladak's *Mathews*-based claims for violations of procedural and substantive due process. These are appropriately governed by *Zadvydas*. And under that standard, "[t]he Court must give appropriate deference" to the respondents' expanded ability to remove Ladak in light of its undisputed power to conduct third-country removals, as well as the respondents' renewed attempts to seek removal to Pakistan. *See Nguyen v. Noem*, 797 F. Supp. 3d at 671. The Court thus does not find a hearing necessary to determine whether changed circumstances make Ladak's removal significantly likely in the reasonably foreseeable future.

Third, the Court credits the respondents' offer of evidence that it is actively seeking removal to Pakistan by applying for travel documents. Ladak previously suggested he would be removed to El Salvador but appears to have since reneged on that claim. *See* Dkt. Nos. 10 at 10 ("What happens when Pakistan does not provide travel documents[?] . . . Ladak does not wish to wait and find out."); 14-1 (noting that ICE sought information from Ladak for removal to Pakistan). The parties now dispute whether Pakistan has denied the documents request. However, the two versions of events are reconcilable: Ladak says his

– 27 –

request has been denied, and ICE says the request has been deemed insufficient for the time being. *Compare* Dkt. Nos. 14-1 at 3, *with* 16 at 3–6. *See also McDonald v. Johnson*, 139 F.3d 1056, 1060 (5th Cir. 1998) (holding that an evidentiary hearing was unnecessary where the Court "had before it affidavits from the two central parties" and where it was "uncertain what additional evidence could have been introduced").

Even so, the Court has found that, on the current record, the combined odds of removal to Pakistan *or* a third country is significantly likely in the reasonably foreseeable future, and that the latent ambiguity about Ladak's ultimate destination does not render his third-country claims ripe. In light of these facts and findings, a hearing is not necessary or warranted to address Ladak's third-country removal claims because of his pending removal attempt to Pakistan. If circumstances change, Ladak may file a new habeas petition.

## 4.    Conclusion

The Court denies Ladak's petition for a writ of habeas corpus (Dkt. No. 1). His motion for a TRO or preliminary injunction (Dkt. No. 2) is denied as moot.

So ordered on December 30, 2025.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE